UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

West Bend Mutual and
SVK Development, Inc.,

                          Plaintiffs,                    **MEMORANDUM OPINION
AND ORDER**

v.                                                    Civil No. 08-907 ADM/JSM

Valley Forge Insurance Company and
Transportation Insurance Company,

                          Defendants.

_____

Frank J. Rajkowski, Esq., Rajkowski Hansmeier LTD., St. Cloud, MN, appeared for and on behalf of Plaintiffs.

Stacy A. Broman, Esq., Meagher & Geer, PLLP, Minneapolis, MN, appeared for and on behalf of Defendants.

_____

## I. INTRODUCTION

On June 17, 2009, the undersigned United States District Judge heard oral argument on Defendants Valley Forge Insurance Company ("Valley Forge") and Transportation Insurance Company's ("Transportation") (collectively "the CNA Insurers") Motion for Summary Judgment on Plaintiffs' Attorney Fee Claim [Docket No. 36], Motion for Summary Judgment on Plaintiffs' Claim for Indemnification of Settlement Amount [Docket No. 43], Motion to Strike Dietz Report and Dietz Affidavit [Docket No. 55], and Motion to Strike the Second Dietz Affidavit and the Covin Affidavit [Docket No. 81]. Also before the Court is Plaintiffs West Bend Mutual ("West Bend") and SVK Development, Inc.'s ("SVK") (collectively "Plaintiffs") Motion for Summary Judgment [Docket No. 41]. For the reasons set forth below, the CNA Insurers Motions are granted in part and denied in part, and Plaintiffs' Motion is denied.

## II. BACKGROUND

On November 21, 2005, the Victoria Ponds Townhome Association (the "Association") filed a suit (the "VPHA suit") against SVK[1] alleging Association homeowners had experienced water infiltration; water seepage and leakage in their walls, ceilings, and other wall elements; frost heaving; stucco cracking; structural defects; erosion; and potential flooding. Miller Aff. [Docket No. 49] Ex. A (VPHA suit Compl.) ¶ 7. The defective conditions that allegedly created these problems were improper installation of the windows, improper flashing of the windows and roof, improper grading of the property, improper installation of the stucco, and violation of applicable building codes. Id. ¶ 8. SVK, as developer and builder of the townhomes had hired contractors and subcontractors to develop and construct the townhomes. Miller Aff. Ex. B (VPHA suit Answer) ¶¶ 3, 4.

SVK had four general liability insurance policies dating from the time construction on the townhomes began in 1996 through February 11, 2005, the date it received notice of the VPHA suit. See Am. Compl. [Docket No. 16] ¶ 8. The policies and coverage periods were:

>American Fire & Cas. Co.    8/30/94-8/30/98
>Transportation Insurance    8/30/98-8/30/99
>Valley Forge Insurance Co.  8/30/99-8/30/00
>West Bend Mutual            8/30/00-8/30/05

Trainor Aff. [Docket No. 40] Ex. D. The CNA Insurers' policies[2] provide:

>a.  We will pay those sums that the insured becomes legally

---

[1] The named defendants in the VPHA suit were SVK Development, Inc., Scott V. Kevitt, Richard Curry, and Ricky I. Habisch. For purposes of this action, the Defendants in the VPHA suit will be referred to as SVK.

[2] The language in the two CNA policies, listed above as Transportation Insurance Co. and Valley Forge Insurance Co., is essentially identical.

> obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. . . .
>
> b. This insurance applies to "bodily injury" and "property damage" only if:
> (1) The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory; and
> (2) The "bodily injury" or "property damage" occurs during the policy period.

Id. Exs. A, B. An "occurrence" is defined as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." Id. "Property damage" is defined as:

> a. Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or
> b. Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

Id.

As the developer, SVK hired subcontractors to perform work on the project. Miller Aff. Exs. C, D. Early in the construction process, SVK became aware of complaints of water intrusion by homeowners. Rajkowski Aff. [Docket No. 46] Ex. 1 (Habish Dep.) at 81-83. While various subcontractors blamed other subcontractors for the problems, SVK instructed the parties to "just get it fixed." Id. at 83. Despite efforts to correct identified defects such as leaking windows, homeowners still experienced problems. Id. Ex. 3 (Gronfor Dep.) at 93-95.

After receiving notice of the VPHA suit, SVK tendered the defense to all the insurers it

3

had purchased a policy from since 1997. Id. Ex. 5 (Covin Dep.) at 98. The CNA Insurers did not immediately respond to the tender, but by 2007 were involved in the defense. Id. at 100-05. Eventually, SVK conducted a tear-off of Unit 7904 to use as an exemplar in determining the extent of the damage to the other units. The experts hired to gauge the extent of the damage found a number of problems including deficiencies with the stucco application and window flashing, projecting walls, window installation, window construction, the roof, and roof gutters. See id. Ex. 7. SVK's defense counsel received repair estimates ranging from $7 to $9 million and ultimately settled the homeowners' case for $1,490,000. Covin Dep. at 101.

In conjunction with this insurance action, Plaintiffs retained forensic wood pathologist, Mark Dietz ("Dietz"), to evaluate the expert reports relied on in settling the VPHA suit. Id. Ex. 9. Dietz opined that "[t]oo many design and protection deficiencies, along with poor building practices doomed these structures from the day construction began." Id. at 5. Dietz testified that a number of factors can degrade building materials. Miller Aff. Ex. E (Dietz Dep.) at 41-49, 52-56, 61-64, 99-100, 109-10. He also testified that "the extent of decay suggests that the [water] intrusion has gone on from the beginning [of the construction process] because nothing has materially changed to alter the original construction techniques." Id. at 107. Dietz further clarified his testimony in an affidavit. Dietz Aff. [Docket No. 48]. Dietz avers that even though he cannot state that water intrusion occurred in all of the buildings at the same time, at least some damage occurred to each home almost immediately upon construction, and all of the damage observed by experts in the VPHA suit "can be traced back to the pathways for water intrusion, which were the result of defects in the original construction of these buildings." Id. ¶¶ 7, 8.

## III. DISCUSSION

A.  **Standard for Summary Judgment**

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall issue "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). On a motion for summary judgment, the Court views the evidence in the light most favorable to the nonmoving party. Ludwig v. Anderson, 54 F.3d 465, 470 (8th Cir. 1995). The nonmoving party may not "rest on mere allegations or denials, but must demonstrate on the record the existence of specific facts which create a genuine issue for trial." Krenik v. County of Le Sueur, 47 F.3d 953, 957 (8th Cir. 1995).

B.  **Indemnification of Settlement Amount**

The CNA Insurers argue the settlement costs should be allocated pro rata by time on the risk because the damage to the townhomes was continuous and was not caused by a single discrete event. Plaintiffs contend the proposed method of allocating costs pro rata by time on the risk is inappropriate in this case because the damage can be traced to construction defects that began at the inception of the construction of the townhomes.

Minnesota follows the "actual injury or injury-in-fact theory to determine which policies have been triggered by an occurrence causing damages for which an insured is liable." Northern States Power Co. v. Fidelity & Cas. Co. of New York, 523 N.W.2d 657, 662 (Minn. 1994)

5

("NSP"). Under the actual injury theory, "only those policies in effect when damage occurred are triggered." Id. "The essence of the actual injury theory is that each insurer is held liable for only those damages which occurred during its policy period; no insurer is held liable for damages outside its policy period." Id. The insured bears the burden of showing that "*some damage* occurred during the policy period." Id. at 663. An injury "can occur even though the injury is not diagnosable, compensable, or manifest during the policy period as long as it can be determined, even retroactively, that some injury did occur during the policy period." In re Silicone Implant Ins. Coverage Litig., 667 N.W.2d 405, 415 (Minn. 2003).

The Minnesota Supreme Court recognized in NSP that in some environmental liability cases where the damages are continuous and where "for all practical purposes the bodily injury or property damage suffered during different policy periods is indivisible" there are special problems allocating damages. 523 N.W.2d at 663. NSP analyzed liability for the clean up of environmental contamination that occurred at an oil and gas plant over a period of forty years. Id. at 659. Because the NSP court was unable to determine that one event resulted in the contamination, the court concluded that "the contamination of the groundwater should be regarded as a continuous process in which the property damage is evenly distributed over the period of time" the contamination occurred. Id. at 664.

A year later in SCSC Corp. v. Allied Mutual Insurance Co., 536 N.W.2d 305, 318 (Minn. 1995), the court found that allocating costs pro rata by time on the risk was not appropriate when evidence demonstrated that the contamination was the result of one significant spill that occurred in one policy year. It distinguished NSP reasoning that, "Our decision in NSP was an equitable decision based upon the complexity of proving in which policy periods covered property damage

arose. In the present case, however, we have sufficient evidence indicating that the damage arose from a single event in 1977." Id. The court further clarified the situations in which courts should allocate pro rata by time on the risk in Domtar, Inc. v. Niagara Fire Insurance Co., 563 N.W.2d 724 (Minn 1997). Domtar addressed environmental contamination which resulted from numerous causes over a period of years where apportionment of damage due to each cause could not be ascertained. Id. at 730. Accordingly, the court found that allocating costs pro rata by time on the risk was appropriate. Id. at 733. The court cautioned, however, that when the damage "arises from discrete and identifiable events, then the actual-injury trigger theory allows those policies on the risk at the point of initial [damage] to pay for all property damage that follows." Id.

In re Silicone represents the court's most recent discussion of the appropriate types of cases for allocating costs pro rata by time on the risk. The court stated:

> First, we determine whether the plaintiffs' injuries are continuous. If they are not, under the actual-injury trigger theory, the policies on the risk at the time of the injury would pay all losses arising from that injury. Here, the court found that the injuries are continuous, so we move to the next determination: whether the continuous injury arose from some discrete and identifiable event. If it does, the policies on the risk at the time of that event are liable for all sums arising from the event. If not, allocation may be appropriate. . . . In our actual-injury trigger framework, allocation is meant to be the exception and not the rule because '[i]t is only in those difficult cases' that allocation is appropriate.

In re Silicone, 667 N.W.2d at 621 (quoting Domtar, 563 N.W.2d at 733) (alteration in original). The parties agree that the damage in this case was continuous, thus, the Court must determine if that damage arose from a discrete and identifiable event.

The CNA Insurers argue that the construction of the townhomes was not a discrete

7

"event" as contemplated by the case law. They contend that numerous factors including storage practices by suppliers, retailers, and subcontractors, the determination of when the stucco first cracked or when the windows first leaked, and the role that environmental factors (such as temperature, the amount of rain, or wind direction) bear on when the damage occurs. The faulty construction, they argue, merely created a condition which made the buildings susceptible to damage and that a condition is not the same as actual damage. Plaintiffs contend that Dietz's report, testimony, and affidavits establish that the damage began almost immediately after construction of the townhomes and that the construction defects were the cause of the damage.

The determinative question here is whether the water intrusion can be traced to a discrete and identifiable event, as in SCSC Corp. and In re Silicone, or if the water intrusion cannot be traced to a discrete and identifiable event, as in NSP and Domtar. In other words, is the faulty construction of a home more closely analogous to a chemical spill or a surgical procedure than it is to environmental contamination resulting from years of seepage and multiple causes. The Court concludes that the construction of a home is not a discrete and identifiable event for purposes of triggering an actual injury analysis and damages are more appropriately apportioned pro rata by time on the risk.

Dietz consistently traces the water intrusion to the overall poor construction of the homes. He writes in his report that "[t]oo many design and protection deficiencies, along with poor building practices doomed these structures from the day construction began." Dietz Report at 5. He also testifies that "the extent of decay suggests that the [water] intrusion has gone on from the beginning [of the construction process] because nothing has materially changed to alter the original construction techniques." Dietz Dep. at 107. He concludes that all of the damage

observed by experts in the VPHA suit "can be traced back to the pathways for water intrusion, which were the result of defects in the original construction of these buildings." Dietz Aff. ¶ 8. However, what Dietz fails to do is identify a discrete event that caused the damage. The construction of a home is not a discrete event in the manner contemplated by the Minnesota Supreme Court. Rather it is the culmination of a series of events much like the multiple causes contemplated by the court in <u>Domtar</u>.

Dietz can be no more specific as to what event caused the damage than to state that the damage dated back to original construction. He averred that "there was too much damage to say there was a recent event. This had to go on pretty much from original construction." Dietz Dep. at 101. Dietz could not, however, pinpoint what singular event caused the damage to occur. He stated that without knowing what flashing, caulking, building papers, taping, and other techniques and materials were used on a given unit, he could not tell when the damage first began. <u>Id.</u> at 62. He also testified that without knowing specifics about the above mentioned factors, he could not tell with a reasonable degree of certainty when any water first got behind the building cladding. <u>Id.</u> Additionally, although Dietz's affidavit states that water would have caused damage to the sheathing almost immediately upon contact, Dietz Aff. ¶ 3, he testified that mere exposure to moisture would not necessarily render a piece of sheathing unusable. Dietz Dep. at 34-35. In neither Dietz's report, his two affidavits,[3] or his testimony does he identify a

---

[3] The CNA Insurers contend that Dietz's report should be stricken under Federal Rule of Civil Procedure 56(e) because it is an unsworn expert report. Dietz, however, verified his report in both his subsequent deposition and in an affidavit. See <u>Maytag Corp. v. Electrolux Home Prods., Inc.</u>, 448 F. Supp. 2d 1034, 1063-65 (N.D. Iowa 2006) (concluding that "subsequent verification or reaffirmation of an unsworn expert's report, either by affidavit or deposition, allows the court to consider the unsworn expert's report on a motion for summary judgment"). The CNA Insurers also argue that the Court should strike Dietz's affidavit because it contradicts

discrete and identifiable event that caused the damage to the townhomes.

In <u>Parr v. Gonzalez</u>, 669 N.W.2d 401, 406-07, (Minn. Ct. App. 2003), the court found that while damage from mold in a house was continuous, it could be traced to a damaged vent cap and, thus, there was a discrete and identifiable event that placed the policy in effect at the time of the damage on the risk. There was no similar identifiable event in this case. Similarly, in <u>Westfield Insurance Co. v. Weis Builders, Inc.</u>, No. 00-987, 2004 WL 1630871, at *4 (D. Minn. July 1, 2004), the court found that water intrusion was continuous and the direct result of the discrete and identifiable event of the installation of the drainage and waterproofing system. <u>Id.</u> at *4. Again, the event in that case was far more specific than general poor construction of a townhome. <u>See</u> <u>also</u> <u>Kootenia Homes, Inc. v. Federated Mut. Ins. Co.</u>, No. A05-278, 2006 WL 224162, at * 6 (Minn. Ct. App. Apr. 18, 2006) (finding that faulty installation of stucco was a discrete and identifiable event that caused the moisture intrusion).

Two other water intrusion cases decided by the Minnesota Court of Appeals address the discrete event analysis. In <u>Donnelly Brothers Construction Company, Inc. v. State Auto Property & Casualty Insurance Co.</u>, 759 N.W.2d 651 (Minn. Ct. App. 2009), the court concluded that a fact question existed as to whether a subcontractor's allegedly defective stucco work was a discrete and identifiable event that occurred prior to the defendant's policy period. The court found that the record before it did not indicate "when the initial water intrusion resulted from [plaintiff's] defective stucco work or when such water intrusion actually caused the damage."

---

his deposition testimony. While courts will disregard affidavits that directly contradict prior deposition testimony, see <u>Camfield Tires, Inc. v. Michelin Tire Corp.</u>, 719 F.2d 1361, 1385 (8th Cir. 1983), Dietz's affidavit merely clarifies his deposition testimony. Accordingly, Plaintiffs' Motion to Strike the Dietz Report and Affidavit is denied.

Id. at 657. In reaching this conclusion, the court noted a distinction between the misapplication of stucco and the actual failure of the stucco, which rendered it inappropriate to simply substitute "the date of the defective work cannot be substituted for the commencement of water intrusion or resulting damage." Id. at 657-58. The case at bar is similar to Donnelly Brothers in that Plaintiffs, through Dietz's testimony, cannot substitute the construction of the house with the actual event that caused the water intrusion and resulting damage. Unlike Donnelly Brothers, however, there is no fact question remaining. The undisputed testimony is that Plaintiffs cannot identify a discrete event that caused the damage.

In Tony Eiden Co. v. State Auto Prop. & Cas. Ins. Co., No. A07-2222, 2009 WL 233883, at * 4 (Minn. Ct. App. Jan. 26, 2009), the court found that pro rata allocation by time on the risk was inappropriate because the district court had found that the damage to the home was caused by a "series of discrete and identifiable events." Id. That court relied heavily on the fact that the district court's findings were "more particular in describing the origins of the property damage and the timing of relevant events." Id. at *5. As noted above, Dietz has been no more particular about the origins of the property damage than targeting "the construction of the house" and the timing has been vaguely described as "almost immediate." For this reason, Tony Eiden is distinguishable.

There is one additional reason why damages in this action should be allocated pro rata by time on the risk. As both parties recognize, if the poor construction of the townhomes is the "occurrence" that triggers the coverage, then that coverage would be barred by the Damage to Property exclusion which excludes damage to property Plaintiffs "own, rent, or occupy." Trainor Aff. Exs. A and B. Because SVK owned the townhomes at the time of construction, it

would not be entitled to coverage under the policies. To circumvent this problem, Plaintiffs argue that the Court should construe the closing of the sale of the homes as the "occurrence" that triggers the policy because the existence of the cause of action can be traced back to that date. They can cite no law to support this contention. A sale does not cause property damage so cannot be the occurrence as defined by the policy. Plaintiffs cannot use the construction of the townhomes as the actual injury trigger but then argue that a different event is the "occurrence" that triggers the policy.

### C. Attorney Fees

As a general rule, "each party bears [its] own attorney fees in the absence of a statutory or contractual exception." Ly v. Nystrom, 615 N.W.2d 302, 314 (Minn. 2000). A narrow exception to the general rule has been carved out in the insurance context and allows a party to collect attorney fees when an insurer breaches its duty to defend. See Morrison v. Swenson, 142 N.W.2d 640, 647 (Minn. 1966). While efforts have been made to expand the ability to collect attorney fees beyond the context of a breach of the duty to defend, the Minnesota Supreme Court has declined to do so. See In re Silicone, 667 N.W.2d at 425. Therefore, the CNA Insurers must have breached the duty to defend in allowing Plaintiffs to receive attorney fees.

It is undisputed that the CNA Insurers did not immediately respond to SVK's notice about the VPHA suit. In early 2006, SVK's counsel sent the CNA Insurers a letter requesting that CNA contribute to one third of the defense costs along with the two other insurers who had issued policies to SVK. Trainor Aff. Ex. G. The CNA Insurers did not begin to contribute to the defense until July 2007, but from that point forward, contributed one third to the defense costs. Id. Ex. I. In October 2007, the CNA Insurers reimbursed Ohio Casualty for one third of the

12

defense costs previously paid by Ohio Casualty. Id. Ex. L. West Bend sent the CNA Insurers two different invoices for its one third of the defense costs in August and November. Id. Exs. M, N. The parties have since determined the correct amount and the CNA Insurers have now paid West Bend for that amount. Trainor Aff. ¶ 28.

Plaintiffs argue that the CNA Insurers' behavior constitutes a breach of the duty to defend. However, the record reflects Plaintiffs have been fully reimbursed for the defense costs that the CNA Insurers would have paid had they joined the defense initially, and, thus, there are no damages. Plaintiffs have cited no authority for the proposition that they are entitled to additional reimbursement for fees, merely because the CNA Insurers, although tardy in undertaking their duty to defend, subsequently reimbursed Plaintiffs for their share of the fees incurred prior to its participation in the defense.

Finally, Plaintiffs argue that the CNA Insurers should contribute one half of the attorney fees because Valley Forge and Transportation are two separate carriers. Plaintiffs' counsel in the VPHA suit treated Valley Forge and Transportation as one entity. See Trainor Aff. Ex. E (Kaftan Dep.) at 35-36 ("I never really paid much attention to whether it was Valley Forge or CNA. It was one and the same to me."); Covin Dep. at 45 ("Q: And you viewed CNA as one carrier? A: Yes. Q: Regardless of whether it was Valley Forge or Transportation? A: Regardless."). For this reason, the CNA Insurers argue that Plaintiffs are estopped from asserting that the CNA Insurers owe one half of the defense costs.

To invoke the doctrine of equitable estoppel, the CNA Insurers must prove that (1) Plaintiffs made promises or inducements; (2) the CNA Insurers reasonably relied on the promises; and (3) the CNA Insurers will be harmed if estoppel is not applied. Hydra-Mac, Inc.

13

v. Onan Corp., 450 N.W.2d 913, 919 (Minn. 1990). The CNA Insurers argue that they were informed (promised) by Plaintiffs' counsel that they would be responsible for one third of the attorney fees, they relied on that promise by paying the invoices sent to them for one third of the defense costs, and they will be harmed both in the form of the additional costs of covering one half of the defense costs and in being exposed to liability for fees in the indemnification action. Plaintiffs argue that equitable estoppel should not apply because the CNA Insurers knew they were separate carriers and that Plaintiffs did not have full knowledge of the facts when it agreed to splitting the costs in thirds. Plaintiffs' argument in unavailing. The CNA Insurers did not attempt to conceal that Valley Forge and Transportation were two separate carriers under the CNA mark, and Plaintiffs' counsel testified that he knew this information and yet still requested only one third of the fees. Nor does Homes Insurance Co. v. National Union Fire Insurance of Pittsburgh, 658 N.W.2d 522 (Minn. 2003), support SVK's contention. Homes involved the question of when a formal tender of defense occurs, not whether an insurer can be estopped from recovering a portion of fees. The CNA Insurers Motion for Summary Judgment on Plaintiffs' Attorney Fee Claim is granted.

**D.    Motions to Strike**

The CNA Insurers move to strike the Dietz Report and Affidavit and the Second Dietz Affidavit and the Covin Affidavit. The Court has addressed the admissibility of the Dietz Report and Affidavit above and that motion is denied. See supra at n.3. The Motion to Strike the Second Dietz Affidavit and the Covin Affidavit is denied as moot because the Court did not consider any information in those affidavits.

## IV. CONCLUSION

Based upon the foregoing, and all of the files, records and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Defendants Valley Forge Insurance Company and Transportation Insurance Company's Motion for Summary Judgment on Plaintiffs' Attorney Fee Claim [Docket No. 36] is **GRANTED**;

2. Defendants Valley Forge Insurance Company and Transportation Insurance Company's Motion for Summary Judgment on Plaintiffs' Claim for Indemnification of Settlement Amount [Docket No. 43] is **GRANTED**;

3. Defendants Valley Forge Insurance Company and Transportation Insurance Company's Motion to Strike Dietz Report and Dietz Affidavit [Docket No. 55] is **DENIED**;

4. Defendants Valley Forge Insurance Company and Transportation Insurance Company's Motion to Strike the Second Dietz Affidavit and the Covin Affidavit [Docket No. 81] is **DENIED** as moot; and

5. Plaintiffs West Bend Mutual and SVK Development, Inc.'s Motion for Summary Judgment [Docket No. 41] is **DENIED**.

**LET JUDGMENT BE ENTERED ACCORDINGLY**.

BY THE COURT:

s/Ann D. Montgomery
ANN D. MONTGOMERY
U.S. DISTRICT JUDGE

Dated: August 31, 2009.